WOOD & OLIVER &c. vs. YEATMAN.

---

CHANCERY.

Case 34.

## Wood & Oliver, &c. vs. Yeatman.

ERROR TO THE LIVINGSTON CIRCUIT.

1. The right of stoppage in *transitu* cannot be superseded by any attachment at the suit of general creditors, levied while the goods are in *transitu*. (2 *Kent* 550; 4 *Dana* 11.) In its nature it is analogous to a lien, and is not forfeited by parting with the possession of the goods. (*Gross on Lien,* 362.) But it must be exercised during the *transitu;* when that terminates, the right of stoppage is lost.

2. In general the *transitu* continues and the right of stoppage by vendor, until the goods have reached the place of destination originally named by the vendee, and have come to his possession. But the vendee may intercept the goods in their transit when the delivery

becomes complete, and the right of stoppage is at an end. (*Se-* Wood & Oliver
comb, *Voorheis & Co. vs. Nutt, &c.* 14 *B. Monroe,* 327; *Mills vs.* &c.
*Ball,* 2 *Bos. & Pul.* 461; *Gross on Lien,* 380.)                          *vs.*
Yeatman.

3. Goods were purchased in Philadelphia, ordered to the vendee at
   Maury county, Tennessee, attached at Pittsburg by a creditor, re-
   lieved from the attachment by the vendee, and delivered to a third
   person, and their destination changed. Held—that the right of
   vendor to stop in *transitu* was gone; that the possession of vendee
   was complete.

4. Though the conduct of a purchaser of goods may be fraudulent, yet
   the right of a purchaser ignorant of that fraud will not be affected
   thereby. (*Arnett vs. Cloudas,* 4 *Dana,* 300; *Parker vs. Patrick,*
   5 *T. R.* 175.)

5. The act of 1838, (3 *Statute Law,* 116,) conferred no additional right
   on a vendor against a fraudulent vendee. It merely gave a more
   summary remedy. (*Bohannon, &c. vs. Kerr, &c.* 1 *B. Monroe,* 87.)

James Davis, of Maury county, Tennessee, in the    Case stated.
fall of 1851, purchased a stock of goods in Philadel-
phia, (as is charged,) with the fraudulent design of
not paying for them. The goods were packed and
addressed to him, and marked with the names, also,
of the vendors, and started from Philadelphia by way
of Pittsburg. At the latter place, while in the pos-
session of the commission merchant, (Forsythe,) to
whose care they had been sent, they were attached
by a creditor of Davis. Davis being at Pittsburg,
appealed to Yeatman for assistance to relieve the
goods, and induced Yeatman to accept a bill for that
object, which was cashed by J. Forsythe, the commis-
sion merchant, and the goods relieved; but to induce
Yeatman to accept, Davis agreed to deliver the goods
to Forsythe & Co., to be forwarded to Nashville, Ten-
nessee; and Davis accordingly ordered J. Forsythe
to deliver the goods to Forsythe & Co., to be shipped
to Yeatman, at Nashville. The goods were handed
over according to order, to Forsythe & Co., and ship-
ped accordingly. One box was shipped direct to Nash-
ville, the others, for want of a boat direct for Nash-
ville, were shipped to Given & Co., at Smithland, Ky.,
an intermediate point between Pittsburg and Nash-
ville, as goods were usually shipped intended to pass
up the Cumberland. The box shipped direct for Nash-

ville was landed at Paducah, the other boxes landed at Smithland, and were placed in the hands of Given & Co.; and on the 21st October, 1851, Wood & Oliver and others, vendors, attached the box at Paducah, and afterwards attached those landed at Smithland, which had already been seized by Yeatman. The suit in McCracken was brought to Livingston and consolidated with the attachment suit there, and tried with it—each party claiming lien and priority of lien. Yeatman's right being adjudged superior, Wood & Oliver and others have appealed to this court.

*J. B. Husbands,* for appellants—

The plaintiffs ask a reversal upon two grounds :

1. That the plaintiffs, as vendors of the goods, retained a lien or right of stoppage in *transitu,* which was not defeated by the action of Davis and Yeatman at Pittsburg.

According to the proof in the case, the purchases made by Davis were made with the fraudulent intent on his part of never paying for the goods ; and if so, no title to the goods vested in him as against the vendors, even in the hands of a *bona fide* purchaser, and more especially against such a claim as that of Yeatman. (See *Smith's Mercantile Law, page* 645,) where it is said that, "when goods are consigned on credit by one merchant to another, it sometimes happens that the consignee becomes bankrupt or insolvent while the goods are on their way to him, and before they are delivered ; in such case it would be hard that the goods of the consignor should be applied in payment of the debts of the consignee. The former is allowed by law to resume possession of them, if he can do so while they are on their way." Whether the effect of such a right, and the resumption of such possession, would amount to a dissolution of the contract of purchase, still remains an open question. Such right is now defined to be "an equitable lien adopted by the law for the purpose of substantial justice ;" or it is the vendor's right in respect of the

price, which is something more than a mere lien, which he will forfeit if he parts with the possession; but it is a right that grows out of his original ownership and dominion. (*Same book, page* 648; also, 2 *Kent's Com.* 541; and, especially, 4 *Dana,* 10, *House & Son vs. Judson.*)

All the authorities sustain the vendor's right to stoppage *in transitu* where the purchaser becomes insolvent, and the goods have not reached their final destination. And so well is this right secured by our law, as well as the mercantile law of every civilized country, that no creditor of such purchaser can, while said goods are in their transit, attach or subject them to his debt, to the prejudice of the vendor.

In this case it does not appear what was the character of the claim upon which the goods were arrested at Pittsburg. I presume it was an ordinary debt due by Davis. If so, that suit could have been defeated by the plaintiff in this case, and of course it follows that the same debt in favor of Yeatman can have no more force in his hands, although paid by him, than in the hands of its original owner; and in no case could such a debt be successfully urged against the right of stoppage *in transitu* by these plaintiffs. But it is said that the suit at Pittsburg, and the compromise of it, the agreement with Yeatman and Davis that the goods should be shipped to Yeatman, Davis' verbal order to Forsythe, and the shipment by Forsythe & Co. to Givens & Co., at Smithland, determined the transit and right of stoppage. To this I answer that the goods were never delivered to Davis or by him to Yeatman; that they all remained in the same boxes, with the same marks, and were continued in their transit, not to Yeatman, but the usual route of travel to Smithland, still in the name of Davis, and while thus in transit, Yeatman himself made the arrest, and then the vendors put in their claims. No bill of lading was changed or made in the name of Yeatman. He took no part in the actual shipment, and in fact no actual change was made in the transit of said goods,

WOOD & OLIVER
&c.
vs.
YEATMAN.

except the portion sent direct to Yeatman, at Nashville, and these he has wholly failed to account for, or give any credit for on his claim. I find no adjudged case, except this one, in which the right of stoppage *in transitu* has been denied, upon facts similar to those presented in this record. While on this branch of the case it is submitted to the court whether or not, upon all the facts presented, it is not reasonable to presume that when Yeatman and Davis made this arrangement at Pittsburg to release the goods, that Yeatman not only knew that the goods had not been paid for, but that Davis was insolvent, and for that reason he had the goods shipped to him, four thousand dollars worth, to secure him for his acceptance for $1,100. If Yeatman knew these things, he was guilty of a gross fraud, and should receive no favors in a court of equity. But his claim should be postponed to the elder equity of the plaintiffs in this case. The goods were the plaintiffs when stopped, and so are their proceeds.

2. Upon the second proposition, that Davis purchased the goods with the fraudulent intent never to pay for them, which is clearly established by the evidence. The vendors' right to come into a court of equity, and urge before the Chancellor, under our act of the Legislature of 1838, (3 *Stat. Law*, 116,) and decisions under said act, (1 *B. Monroe*, 87,) as between Davis and these complainants, there can be no doubt; and if, as the record shows, Yeatman, when he came into the matter, knew of the fraud of Davis, the law is equally clear as to him. But if Davis purchased the goods fraudulently, not intending to pay for them, concealing his insolvency, and Yeatman had no knowledge of such fraud, still it is insisted Yeatman cannot claim the goods against the vendors; because in all such cases no title passes to the vendee, and, of course, none to the sub-vendee. (*Smith's Mercantile Law*, 597, *and notes in full.*) The vendor still retaining his right, unless, after knowledge of the fraud, he assents to a sale, and the sub-

vendee can only hold when he has paid value for the
goods without notice of any fraud, and that, too,
where the vendee had actual possession at the time
of the sale, with the vendor's assent.

For these reasons a reversal is asked.

*F. H. Dallam*, for defendant—

"The right of stoppage *in transitu*, or, in other
words, of resuming possession of them by a vendor
or consignor before they reach the hands of the ven-
dee or consignee, is a purely equitable privilege per-
taining to such vendor or consignor, so long as the
price of the goods remains unpaid, and the legal title
continues in those parties.    Till delivery or actual
payment, *or some act equivalent to actual transfer of the
possession of the goods*, the law considers the contract
ambulatory ; and in case of the insolvency of the
vendee, meanwhile empowers the vendor to resort
to a detainor of them, in order to secure himself the
payment of the price.    Founded on equitable prin-
ciples, and originally established in courts of equity,
this doctrine has, however, since been recognized and
adopted in courts of law.    The power of re-seizure
determines with *the delivery of the goods*, and there are
no instances in which the vendor or consignor, having
once actually parted with the legal ownership, has
been suffered to re-take them in opposition to a ven-
dee or consignee who has obtained the legal title."

These are the words in which Mr. Gross, in his *Law
of Lien*, *page* 21, in the opening of the first chapter,
defines and limits the doctrine of the right of stop-
page *in transitu*.    He then proceeds to contrast it
with the right of lien, to which the greater part of the
treatise is devoted.    On page 232, when treating
more fully the doctrine of stoppage *in transitu*, he
mentions the regrets expressed, "that goods actually
delivered after the consignee's bankruptcy," and dis-
tinguishable, should ever have been considered a part
of the bankrupt's effects ; but acknowledges that it is
so.    On page 236, he says: "The *transitus* is at an

end when the property comes into the actual possession of the vendee." On page 237: "It is not necessary, in order to divest the consignor's right to stoppage *in transitu*, that they should have been taken by the very hands of the consignee, himself. They may be marked, for instance, by a provisional assignee of the consignee, if a bankrupt, *before arrival at the place where the consignee* is in the habit of receiving them." On page 242, he quotes Lord Alvanley's words : "If the vendee meet the goods on the road, and take them into his possession, the goods will then have arrived at their journey's end, with reference to the right of stoppage." This language is used in an opinion in a case where the right of stoppage was involved, referred to in the preceding page of that work. See, also, the authorities cited immediately following, in support of Lord Alvanley's opinion. The whole treatise sustains this view.

It is not believed that there is anything in the case of *House & Son vs. Judson, &c.* 4 *Dana*, 10, which changes or modifies these principles ; on the contrary the learned judge in that case has expressly forborne to decide the point, on the ground "that there was no act of that sort in the case," yet his reasoning and authorities quoted sustain, substantially, the doctrine contended for.

It is argued on the other side that no delivery from Davis to Yeatman took place in Pittsburg, because the goods were not taken out of the boxes and put into the actual possession of Davis or Yeatman. This question is easily decided by reference to the deposition of the only witness who speaks upon that point. (*See page* 77.) The goods had been attached in the hands of Jacob Forsythe, Jr., a different house to which they had been consigned. "The goods were handed to Forsythe & Co., on Davis' order, for this object," that is, the object of shipping to Yeatman. "Davis and Yeatman were both here," says the witness.

But it is said that it is reasonable to presume that Yeatman knew at Pittsburg that the goods were not paid for, and that Davis was insolvent. It may be replied : Why advance $1,050 to a fraudulent, broken man, with no greater prospect of gain than the ordinary profit of a receiving and forwarding merchant ? It is not perceived how the fraud of Davis, if any was committed, in the purchase of the goods, can affect Yeatman, an innocent incumbrancer, or overrule the equitable maxim, "that he who trusts most must lose most."

The testimony which the clerk failed to send up, shows satisfactorily the credit allowed by Yeatman for the box of goods received.

There is no error in the decree of the Circuit Court.

Judge STITES delivered the opinion of the Court—

January 29.

In the fall of 1851, James Davis, of Maury county, Tennessee, went to Philadelphia, and, with the fraudulent design of not paying for the same, bought on a credit, of the appellants, an assorted stock of goods, suitable for the Tennessee market.

The goods were packed in boxes, marked with his name and address, as well as the names of the vendors, and forwarded by the usual conveyances to Jacob Forsythe, Jr., a commission merchant at Pittsburg, on their way to their final destination in Tennessee.

At Pittsburg they were attached by a creditor of Davis for the satisfaction of a debt of about $1,000. Davis, who was there, induced the appellee, Yeatman, to relieve the goods from this attachment, by accepting a draft at sixty days for the amount of the debt, which was cashed by Forsythe, and the attachment discharged. Yeatman, however, exacted as indemnity, that the goods should be delivered to the house of Forsythe & Co., and by them forwarded to him at Nashville, he being a commission merchant at that place, and refused to accept the draft unless this

was done. Davis having previously agreed to do this so soon as the goods were released, gave an order to Jacob Forsythe, Jr., his consignee, to deliver them to Forsythe & Co., to be shipped by them to Yeatman, at Nashville, as agreed on.

In obedience to this order, the goods were delivered, or, as the witness Forsythe says, "handed" over to Forsythe & Co., of which firm he was a member, to be shipped accordingly. The same witness proves that one box was shipped direct to Nashville to Yeatman, and that the other packages would have been thus shipped, but there was then no boat in port for Nashville, and in consequence thereof they were shipped to Given & Co., at Smithland, an intermediate port between Pittsburg and Nashville, where goods are usually re-shipped up the Cumberland to the latter place. All the goods, including the package shipped direct to Nashville, except one box, which was landed at Paducah, were delivered to Given & Co., at Smithland, and were, in their hands, on the 21st October, 1851, attached by the appellee, upon sufficient allegations of fraud, &c., against Davis. On the 25th October, 1851, Wood & Oliver and others, the original vendors, attached, at Paducah, in McCracken county, the box of goods left there, and afterwards caused attachments to be levied on the goods at Smithland, which had already been seized by Yeatman. There being separate suits in Livingston and McCracken counties, both brought to subject the same property, they were taken, by change of venue, from McCracken to Livingston, and there consolidated. The creditors, who were the vendors, claimed, in virtue of their right of stoppage *in transitu*, a superior and paramount lien to Yeatman. He, on the contrary, insisted that his lien was prior in time, and that his debt should be first satisfied. All the parties having been brought before the court, and the goods having been sold, it was adjudged upon final hearing, that the vendors had not manifested a prior right, and that they should be postponed, and Yeatman's debt

first satisfied, and the remainder distributed amongst them, *pro rata.*

Of this judgment the vendors complain, and have brought the case up.

The grounds relied on for reversal are—1. That the lien of the vendors should have been held superior, their right of stoppage *in transitu* being, as is insisted, at the date of the levy of their attachment complete; and 2. That as it was manifest that Davis had in the outset bought fraudulently, with the intention of never paying for the goods, their title to them had never been divested, and still remained good against him or Yeatman.

Inasmuch as Yeatman's attachment was prior in time, it devolved on the appellants to show a superior equity before he could be postponed.

If, as is argued, their right of stoppage *in transitu* was operative and in effect, when Yeatman's attachment was levied, there can be no doubt that he should have been treated as a general creditor, and as against them deferred until their demands were satisfied. This right of stoppage *in transitu* has been held to be coeval with, and springing out of, the very contract by which the vendee claims the goods, and cannot be superseded by an attachment at the suit of a general creditor, levied while the goods are *in transitu.* (2 *Kent's Com.* 550; *House & Son vs. Judson,* 4 *Dana,* 11.) Though originally founded in equity, it has long been considered and acted upon as a legal remedy. In its foundation it is analgous to that of lien, but can only be exercised in respect of the identical goods on which the claim is founded. Nor is it a mere lien forfeited by parting with the possession of the goods, but grows out of the original ownership and dominion. (*Gross on Lien,* 362.)

But the right must be exercised during the *transitus,* for when that terminates, the right of stoppage is gone. "In general the *transitus* continues until the goods have reached their place of destination originally named by the vendee, and have come to his posses-

WOOD & OLIVER &c. *vs.* YEATMAN.

1. The right of stoppage *in transitu* cannot be superseded by any attachment at the suit of general creditors, levied while the goods are *in transitu.* (2 *Kent,* 550; 4 *Dana,* 11.) In its nature it is analogous to a lien, and is not forfeited by parting with the possession of the goods.— (*Gross on Lien,* 362.) But it must be exercised during the *transitus;* when that terminates, the right of stoppage is lost.

2. In general the *transitus* continues and the right of stoppage by vendor, until the goods have reached

WOOD & OLIVER
&c.
vs.:
YEATMAN.

the place of destination originally named by the vendee, and have come to his possession. But the vendee may intercept the goods in their transit when the delivery becomes complete, and the right of stoppage is at an end. (Secomb, Voorheis, & Co. vs. Nutt, &c. 14 B. Monroe, 327; Mills vs. Ball, 2 Bos. & Pul. 461; Gross on Lien, 380.)

sion." Formerly it was held that even an actual possession prematurely taken by the vendee, did not end the transitus; but as settled by this court in Secomb, Voorhies & Co. vs. Nutt, &c. 14 B. Monroe, 327, "the established doctrine is, that if the vendee intercepts the goods in their passage to him, and takes possession as owner, the delivery is complete, and the right of the vendor to stop at an end."

So in the case of Mills vs. Ball, 2 Bos. & Pul. 461, it was held by Lord Alvanley, "that if in the course of the conveyance of the goods from the vendor to the vendee, the latter meets them on the road and takes them into his own possession, the goods will have arrived at their journey's end with reference to the right of stoppage." (Gross on Lien, 380.)

When the foregoing principles are applied to the case now under consideration, we think it clear that the right of the appellants to stoppage in transitu was terminated at Pittsburg, and that they did not occupy the attitude of privileged creditors over the appellee, whose attachment was prior in date, and first levied.

3. Goods were purchased in Philadelphia, ordered to the vendee at Maury county, Tennessee, attached at Pittsburg by a creditor, relieved from the attachment by the vendee, and delivered to a third person, and their destination changed. Held—that the right of vendor to stop in transitu was gone; that the possession of vendee was complete.

The goods were seized in Pittsburg; Davis was present; Yeatman came to his relief, and when, by his assistance, the goods were released, Davis, as he had previously agreed to do, for Yeatman's indemnity, took possession of the goods by ordering the original consignee to deliver them to Forsythe & Co., with directions to ship them to Nashville. The order to Jacob Forsythe was not conditional, as was the order to Marsh and Rowlett, in the case of Secomb, &c. vs. Nutt, (supra,) but was express, and, as the witness testifies, was obeyed. The goods were delivered to Forsythe & Co., and by them shipped to Given & Co., at Smithland, an appropriate intermediate port for re-shipment to Nashville.

The acts of Davis at Pittsburg were, in our opinion, tantamount to an actual assumption of possession and delivery to Yeatman. The goods no longer proceeded under "the original impulse" given to them at Philadelphia, but under the orders of Davis, the

vendee, given in person at Pittsburg, when and where the *transitus*, in reference to the right of stoppage in the appellants, ended.

With regard to the second objection taken to the judgment below, we are of opinion that it is not tenable.

It is manifest that Davis was guilty of a gross fraud upon the appellants, but the consequences of his conduct should not be visited upon the appellee, who, so far as this record shows, was altogether ignorant of Davis' motive or design in making the purchase of goods.   To the extent of the amount paid by him for the release of the goods, and the lien asserted therefor, he acquired an equity which ought not to be impaired by the fraud of Davis, of which he had no notice.

The goods had been bought by Davis, marked in his name, thus shipped to Pittsburg, and subject to his order.   Surely Yeatman had the right to suppose they belonged to him, and upon the faith of a virtual pledge which was made of the goods, to advance money or become liable therefor in order to release them from attachment.

The 1st section of the act of 1838, 3 *vol. Statute Law*, 116, conferred no additional right on a vendor against a fraudulent vendee.   The act merely gave him a more summary remedy, as was intimated in *Bohannon, &c. vs. Kerr, &c.*, 1 *B. Monroe*, 87.

In *Arnett vs. Cloudas*, 4 *Dana*, 300, a more flagrant fraud, if possible, was perpetrated on the vendor than in the present case, and for which the perpetrator was sent to the penitentiary ; yet, it was held that the vendor, though paid nothing for his slave but counterfeit bank notes, could not, as against an innocent purchaser, without notice and for value, maintain an action to recover the slave; and in that case, reference was made to *Parker vs. Patrick*, 5 *T. R.* 175, in which it was said, "that when goods obtained from A by false pretences, had been pawned to B for a valuable consideration, and A obtained posses-

*Margin notes:*

WOOD & OLIVER
&c.
vs.
YEATMAN.

4. Though the conduct of a purchaser of goods may be fraudulent, yet the right of a purchaser ignorant of that fraud will not be affected thereby.   (*Arnett vs. Cloudas*, 4 *Dana*, 300; *Parker vs. Patrick*, 5 *T. R.* 175.)

5. The act of 1838, (3 *Statute Law*, 116,) conferred no additional right to a vendor against a fraudulent vendee.   It merely gave a more summary remedy.   (*Bohannon, &c. vs. Kerr, &c.* 1 *B. Monroe*, 87.)

sion of the goods, it was held that B might maintain trover for them." A state of fact almost precisely analagous to the present.

We perceive no error in the judgment of the Circuit Court prejudicial to appellants, and it must therefore be affirmed.